1

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT

9

FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11

UNITED STATES OF AMERICA,

No. 1:95-cr-05038-DAD

12

Plaintiff,

ORDER DENYING DEFENDANT'S
MOTION TO VACATE, SET ASIDE, OR
CORRECT HIS SENTENCE PURSUANT TO
28 U.S.C. § 2255 AND GRANTING
DEFENDANT'S EMERGENCY MOTION
FOR MODIFICATION OF SENTENCE
PURSUANT TO 18 U.S.C. § 3582(c)(1)(A)

13

v.

14

ROBERT ANTHONY SANCHEZ,

15

Defendant.

16

(Doc. Nos. 134, 143)

17

18

19

Pending before the court is defendant Robert Anthony Sanchez's motion to vacate, set

20

aside, or correct his sentence pursuant to 28 U.S.C. § 2255 (Doc. No. 134), as well as his motion

21

for a reduction of his sentence pursuant to 18 U.S.C. § 3582(c)(1)(A) (Doc. No. 143). For the

22

reasons explained below, defendant's motion brought pursuant to § 2255 will be denied, and

23

defendant's motion brought pursuant to § 3582 will be granted.

24

**BACKGROUND**

25

On March 2, 1995, an indictment was returned charging defendant Sanchez in Counts

26

One, Three, Five, Seven, Nine, Eleven, Thirteen, and Fifteen with interference with commerce by

27

robbery in violation of 18 U.S.C. § 1951(a); Counts Two, Four, and Six with use of a firearm

28

during a crime of violence in violation of 18 U.S.C. § 924(c)(1); and Counts Eight, Ten, Twelve,

1   Fourteen, and Sixteen with use of a firearm during a crime of violence and aiding and abetting the

2   same in violation of 18 U.S.C. §§ 924(c)(1) and (2).  (Doc. Nos. 1; 134-1, Ex. C.)  On February

3   21, 1995, defendant entered a plea of guilty to Counts One, Two, Five, Six, Seven, Nine, and

4   Thirteen of the indictment.  (Doc. No. 134-1, Ex. D.)  On January 23, 1996, defendant Sanchez

5   was sentenced to a 63-month term of imprisonment as to Counts One, Five, Seven, Nine, and

6   Thirteen with those terms to be served concurrently with each other; a 60-month term of

7   imprisonment as to Count 2; and a 240-month term of imprisonment as to Count 6 with those

8   terms to be served consecutively both to one another and to the 63 month term imposed on the

9   interference with commerce by robbery counts, constituting an aggregate 363-month term of

10  imprisonment in the custody of the U.S. Bureau of Prisons ("BOP") to be followed by a 60 month

11  term of supervised release.  (Doc. No. 134-1, Ex. A.)  The court also imposed the mandatory

12  special assessments in the amount of $350.00, and ordered that restitution be made in the amount

13  of $2,387.00.  (*Id.*)

14          When defendant Sanchez filed the present motions, he was serving his sentence of

15  imprisonment at BOP's Federal Correctional Institution, Fairton ("FCI Fairton") in New Jersey.

16  (*See* Doc. No. 143 at 41.)  As of December 18, 2020, defendant stated it was his "understanding

17  that the Bureau of Prisons [] intend[ed] to place him in a halfway house in Oakland, California,

18  more than three hours away from his support network, as early as 4 months from [then]."  (Doc.

19  No. 143 at 2.)  At the June 30, 2021 hearing on the pending motion for compassionate release,

20  defense counsel represented that defendant Sanchez has been in that halfway house since April

21  2021.  As of the date of this order, defendant Sanchez has served approximately 317 months of

22  his 363-month prison sentence with pre-sentencing jail time credits taken into account.  (*See* Doc.

23  No. 151-1, Ex. 1.)  Accounting for prison good time credits as well, defendant Sanchez's

24  projected release date is now February 5, 2022.  (*See id.*)

25  /////

26  /////

27  /////

28  /////

2

Defendant Sanchez timely filed his pending § 2255 motion on June 23, 2016.[1]  (Doc. No. 134.)  On April 19, 2017, the government filed its opposition to the motion, and on April 26, 2017, defendant filed his reply thereto.  (Doc. Nos. 137, 138.)  Thereafter, defendant filed the pending motion seeking relief under § 3582 on October 23, 2020.  (Doc. No. 143.)  On November 18, 2020, the government filed its opposition to the § 3582 motion, and on December 18, 2020, defendant filed his reply thereto.  (Doc. Nos. 151, 160.)  The court held a hearing on defendant's § 3582 motion on June 30, 2021, at which counsel appeared.  (Doc. No. 163.)

## LEGAL STANDARDS

### A.    28 U.S.C. § 2255 Motions

A federal prisoner making a collateral attack against the validity of his or her conviction or sentence must do so by way of a motion to vacate, set aside, or correct the sentence pursuant to 28 U.S.C. § 2255 filed in the court which imposed the sentence.  *United States v. Monreal*, 301 F.3d 1127, 1130 (9th Cir. 2002).  Section 2255 provides four grounds upon which a sentencing court may grant relief to a federal prisoner:  (1) the sentence was imposed in violation of the Constitution or laws of the United States; (2) the court was without jurisdiction to impose such sentence; (3) the sentence was in excess of the maximum authorized by law; or (4) the sentence is otherwise subject to collateral attack.  28 U.S.C. § 2255(a); *see also Davis v. United States*, 417

---

[1]  Defendant Sanchez filed an application for leave to file a second or successive § 2255 motion on June 23, 2016, and the Ninth Circuit granted that application on March 10, 2017.  (Doc. No. 133.)  Defendant's § 2255 motion was deemed filed on June 23, 2016, per the Ninth Circuit's order.  (*Id.*)  The United States Supreme Court decided *Johnson v. United States*, 576 U.S. 591 (2015) ("*Johnson II*") on June 26, 2015, and defendant filed his § 2255 motion within one year of that date as required by 28 U.S.C. § 2255(f)(3).  The government argues that defendant's petition is time barred because *Johnson II* is only retroactively applicable to Armed Career Criminal Act ("ACCA") cases on collateral review, and defendant was not sentenced under the ACCA.  (Doc. No. 137 at 35.)  However, "courts throughout this case (including this Court) have found that *Johnson II*'s retroactivity is not limited to cases involving the ACCA's residual clause, but have expanded its reach to cases that implicate similar language[.]"  *United States v. Bustos*, No. 1:08-cr-297-LJO-3, 2016 WL 6821853, at *5 (E.D. Cal. Nov. 17, 2016).  Accordingly, defendant's § 2255 motion pending in this case is timely.  *See id.* at *6  ("Thus, because *Johnson II* announced a new substantive rule retroactively applicable to § 924(c)(1)(A) cases on collateral review, and because Petitioner filed his § 2255 motion within one year of the date *Johnson II* was decided, Petitioner's motion is timely under § 2255(3)(f)."); *Welch v. United States*, ___U.S.___, 136 S. Ct. 1257, 1268 (2016) ("It follows that *Johnson* announced a substantive rule that has retroactive effect in cases on collateral review.").

U.S. 333, 344–45 (1974); *Monreal*, 301 F.3d at 1130; *United States v. Barron*, 172 F.3d 1153, 1157 (9th Cir. 1999).

To warrant the granting of relief, the movant must demonstrate the existence of an error of constitutional magnitude which had a substantial and injurious effect or influence on the guilty plea or the jury's verdict. *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993); *see also United States v. Montalvo*, 331 F.3d 1052, 1058 (9th Cir. 2003) ("We hold now that *Brecht's* harmless error standard applies to habeas cases under section 2255, just as it does to those under section 2254."). Such relief is warranted only where a movant has shown "a fundamental defect which inherently results in a complete miscarriage of justice." *Davis*, 417 U.S. at 346; *see also United States v. Gianelli*, 543 F.3d 1178, 1184 (9th Cir. 2008).

"[A] district court must grant a hearing to determine the validity of a petition brought under [§ 2255], '[u]nless the motions and the files and records of the case conclusively show that the prisoner is entitled to no relief.'" *United States v. Blaylock*, 20 F.3d 1458, 1465 (9th Cir. 1994) (quoting 28 U.S.C. § 2255). The court may deny a hearing if the movant's allegations, viewed against the record, fail to state a claim for relief or "are so palpably incredible or patently frivolous as to warrant summary dismissal." *United States v. McMullen*, 98 F.3d 1155, 1159 (9th Cir. 1996) (internal quotation marks omitted); *see also United States v. Withers*, 638 F.3d 1055, 1062–63 (9th Cir. 2011); *United States v. Leonti*, 326 F.3d 1111, 1116 (9th Cir. 2003). To warrant a hearing, therefore, the movant must make specific factual allegations which, if true, would entitle him to relief. *Withers*, 638 F.3d at 1062; *McMullen*, 98 F.3d at 1159. Mere conclusory assertions in a § 2255 motion are insufficient, without more, to require the court to hold a hearing. *United States v. Hearst*, 638 F.2d 1190, 1194 (9th Cir. 1980).

**B.      18 U.S.C. § 3582(c) Motions**

A court generally "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c); *see also Dillon v. United States*, 560 U.S. 817, 824 (2010) ("'[A] judgment of conviction that includes [a sentence of imprisonment] constitutes a final judgment' and may not be modified by a district court except in limited circumstances."). Those limited circumstances include compassionate release in extraordinary cases. *See United States v. Holden*,

452 F. Supp. 3d 964, 968 (D. Or. 2020). Prior to the enactment of the First Step Act of 2018 ("the FSA"), motions for compassionate release could only be filed by the BOP. 18 U.S.C. § 3582(c)(1)(A) (2002). Under the FSA, however, imprisoned defendants may now bring their own motions for compassionate release in the district court. 18 U.S.C. § 3582(c)(1)(A) (2018). In this regard, the FSA specifically provides that a court may

> upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the [BOP] to bring a motion on the defendant's behalf[2] or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in [18 U.S.C. §] 3553(a) to the extent that they are applicable, if it finds that –
>
> (i)    extraordinary and compelling reasons warrant such a reduction; or
>
> (ii)   the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the Bureau of Prisons that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g);
>
> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission[.]

18 U.S.C. § 3582(c)(1)(A)(i) and (ii).[3]

---

[2] If the BOP denies a defendant's request within 30 days of receipt of such a request, the defendant must appeal that denial to the BOP's "Regional Director within 20 calendar days of the date the Warden signed the response." 28 C.F.R. § 542.15(a). If the regional director denies a defendant's administrative appeal, the defendant must appeal again to the BOP's "General Counsel within 30 calendar days of the date the Regional Director signed." *Id.* "Appeal to the General Counsel is the final administrative appeal." *Id.* When the final administrative appeal is resolved, a defendant has "fully exhausted all administrative rights." *See* 18 U.S.C. § 3582(c)(1)(A).

[3] Under 18 U.S.C. § 3624(c)(2), the BOP may release an incarcerated defendant to home confinement "for the shorter of 10 percent of the term of imprisonment of that prisoner or 6 months." The Coronavirus Aid, Relief, and Economic Security Act ("the CARES Act"), Pub. L. 116-136, expands the BOP's authority to release incarcerated defendants without judicial intervention. The CARES Act allows the BOP to "lengthen the maximum amount of time" for

The applicable policy statement with respect to compassionate release in the U.S. Sentencing Guidelines sets out criteria and circumstances describing "extraordinary and compelling reasons." U.S. Sent'g Guidelines Manual ("U.S.S.G.") § 1B1.13 (U.S. Sent'g Comm'n 2018)[4]; *see also United States v. Gonzalez*, 451 F. Supp. 3d 1194, 1197 (E.D. Wash. 2020) (noting that many courts have relied on U.S.S.G. § 1B1.13 to define "extraordinary and compelling reasons," even though that policy statement was issued before Congress passed the FSA and authorized defendants to file compassionate release motions). However, the Ninth Circuit recently held "that the current version of U.S.S.G. § 1B1.13 is not an 'applicable policy statement[ ]' for 18 U.S.C. § 3582(c)(1)(A) motions filed by a defendant." *United States v. Aruda*, 993 F.3d 797, 802 (9th Cir. 2021). "In other words, the Sentencing Commission has not yet issued a policy statement 'applicable' to § 3582(c)(1)(A) motions filed by a defendant." *Id.* The Ninth Circuit clarified that "[t]he Sentencing Commission's statements in U.S.S.G. § 1B1.13

---

which a prisoner may be placed in home confinement under § 3624(c)(2) "as the Director determines appropriate," assuming "the Attorney General finds that emergency conditions will materially affect the functioning" of the BOP. CARES Act, Pub. L. 116-136, Div. B, Title II, § 12003(b)(2) (2020). However, the BOP's authority in this regard is limited to "the covered emergency period." *Id.* The BOP's authority expires "30 days after the date on which the national emergency declaration terminates." *Id.* § 12003(a)(2). After the CARES Act was enacted, the Attorney General issued a memo instructing the BOP to "immediately review all inmates who have COVID-19 risk factors" beginning with those who are housed at facilities where "COVID-19 is materially affecting operations." Office of Att'y Gen., *Increasing Use of Home Confinement at Institutions Most Affected by COVID-19* (Apr. 3, 2020). The BOP has acted on the Attorney General's guidance, including one case in which a sentenced prisoner was released to home confinement after serving less than half his sentence from a facility that reported no positive COVID-19 cases at the time of his release. *See* Hannah Albarazi, *Paul Manafort Seeks Prison Release Over COVID-19 Fears*, Law360 (Apr. 14, 2020), https://www.law360.com/articles/1263706/paul-manafort-seeks-prison-release-over-covid-19-fears (noting that the prisoner's counsel had argued that the CARES Act "broadens the authority" of the BOP to release prisoners to home confinement); Khorri Atkinson, *Paul Manafort Released From Prison Amid COVID-19 Fears*, Law360 (May 13, 2020), https://www.law360.com/articles/1273090/paul-manafort-released-from-prison-amid-covid-19-fears.

[4] According to U.S.S.G. § 1B1.13(2), to be granted a reduction of sentence under 18 U.S.C. § 3582(c)(1)(A), the defendant must not pose "a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." U.S.S.G. § 1B1.13(2). However, as the Ninth Circuit recently clarified, "[t]his dangerousness finding is not statutorily required under 18 U.S.C. § 3582(c)(1)(A)(i), but [it] is part of the Sentencing Commission's policy statement in U.S.S.G. § 1B1.13(2)." *United States v. Aruda*, 993 F.3d 797, 799 (9th Cir. 2021).

may inform a district court's discretion for § 3582(c)(1)(A) motions filed by a defendant, but they are not binding." *Id.* (citing *United States v. Gunn*, 980 F.3d 1178, 1180 (7th Cir. 2020)).

In so holding, the Ninth Circuit joined the five other circuits who have addressed this issue and have unanimously held "that U.S.S.G. § 1B1.13 only applies to § 3582(c)(1)(A) motions filed by the BOP Director, and does not apply to § 3582(c)(1)(A) motions filed by a defendant." *Id.*; *see, e.g.*, *United States v. Brooker (Zullo)*, 976 F.3d 228, 237 (2d Cir. 2020) ("[T]he First Step Act freed district courts to consider the full slate of extraordinary and compelling reasons that an imprisoned person might bring before them in motions for compassionate release. Neither Application Note 1(D), nor anything else in the now-outdated version of Guideline § 1B1.13, limits the district court's discretion."); *United States v. Jones*, 980 F.3d 1098, 1111 (6th Cir. 2020) ("In cases where incarcerated persons file motions for compassionate release, federal judges may skip step two of the § 3582(c)(1)(A) inquiry and have full discretion to define 'extraordinary and compelling' without consulting the policy statement § 1B1.13."); *Gunn*, 980 F.3d at 1181 ("[T]he Guidelines Manual lacks an 'applicable' policy statement covering prisoner-initiated applications for compassionate release. District judges must operate under the statutory criteria—'extraordinary and compelling reasons'—subject to deferential appellate review."); *United States v. McCoy*, 981 F.3d 271, 284 (4th Cir. 2020) ( "In short, we agree with the Second Circuit and the emerging consensus in the district courts: There is as of now no 'applicable' policy statement governing compassionate-release motions filed by defendants under the recently amended § 3582(c)(1)(A), and as a result, district courts are 'empowered . . . to consider any extraordinary and compelling reason for release that a defendant might raise.'") (citation omitted); *United States v. Maumau*, 993 F.3d 821, 837 (10th Cir. 2021) ("We therefore agree with the district court that under the second part of § 3582(c)(1)(A)'s test, its finding that extraordinary and compelling reasons warranted a reduction in Maumau's case was not constrained by the Sentencing Commission's existing policy statement, U.S.S.G. § 1B1.13.").

In the past, when moving for relief under 18 U.S.C. § 3582(c), it was recognized that the defendant bore the initial burden of demonstrating that a sentence reduction was warranted. *See*

1    *United States v. Sprague*, 135 F.3d 1301, 1306–07 (9th Cir. 1998).  Although the Ninth Circuit

2    has not specifically addressed the question of which party bears the burden in the context of a

3    motion for compassionate release brought pursuant to § 3582(c) as amended by the FSA, district

4    courts to have done so agree that the burden remains with the defendant.  *See, e.g.*, *United States*

5    *v. Greenhut*, No. 2:18-cr-00048-CAS, 2020 WL 509385, *1 (C.D. Cal. Jan. 31, 2020); *United*

6    *States v. Van Sickle*, No. 18-cr-0250-JLR, 2020 WL 2219496, *3 (W.D. Wash. May 7, 2020).

7                                                **ANALYSIS**

8    **A.       Defendant Sanchez's 28 U.S.C. § 2255 Motion**

9            In defendant Sanchez's § 2255 motion, he argues that his convictions under 18 U.S.C.

10   § 924(c) cannot stand because interference with commerce by robbery in violation of 18 U.S.C.

11   § 1951(a)—also referred to as Hobbs Act robbery—is not a "crime of violence" within the

12   meaning of 18 U.S.C. § 924(c)(3).  Defendant's argument is based on two grounds:  (1) that

13   § 924(c)(3)(B), the section's residual clause, is void as unconstitutionally vague; and (2) that

14   Hobbs Act robbery is not a "crime of violence" under § 924(c)(3)(A), the elements clause.

15           Section § 924(c)(1)(A) provides penalties for a person "who, during and in relation to any

16   crime of violence . . . , uses or carries a firearm, or who, in furtherance of any such crime,

17   possesses a firearm."  A "crime of violence" is defined as

18                  an offense that is a felony and--

19                  (A) has as an element the use, attempted use, or threatened use of
                    physical force against the person or property of another, or
20
                    (B) that by its nature, involves a substantial risk that physical force
21                  against the person or property of another may be used in the course
                    of committing the offense.
22

23   *Id.* § 924(c)(3).  Thus, "[a] 'crime of violence' for purposes of § 924(c)(1) is defined in one of

24   two ways, through either the 'elements clause' of 18 U.S.C. § 924(c)(3)(A) or the 'residual

25   clause' of 18 U.S.C. § 924(c)(3)(B)."  *Alvarez v. United States*, No. 1:03-cr-5014 AWI, 2020 WL

26   3470522, at *2 (E.D. Cal. June 25, 2020) (citing *United States v. Watson*, 881 F.3d 782, 784 (9th

27   Cir. 2018)).

28   /////

                                                      8

The court will first consider defendant's argument that the residual clause of § 924(c) was rendered unconstitutionally vague by the Supreme Court's holding in *Johnson II*, which invalidated a similarly phrased residual clause in the ACCA. *Johnson II*, 576 U.S. at 597. The government violates the Fifth Amendment of the United States Constitution "by taking away someone's life, liberty, or property under a criminal law so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement." *Johnson II*, 576 U.S. at 595. This applies "not only to statutes defining elements of crimes, but also to statutes fixing sentences." *Id.* at 596 (citing *United States v. Batchelder*, 442 U.S. 114, 123 (1979)).

When defendant Sanchez filed his pending §2255 motion in 2016, the gravamen of the motion was that the *Johnson II* holding had rendered § 924(c)(3)(B) unconstitutionally vague based on parallels between the wording of the ACCA's residual clause and § 924(c)(3)(B). (*See* Doc. No. 134 at 9–18.) Since the parties completed the briefing as to that motion, however, the Supreme Court resolved this precise issue in *United States v. Davis*, ___U.S.___, 139 S. Ct. 2319 (2019). In *Davis*, the Supreme Court explicitly held that "§ 924(c)(3)(B) is unconstitutionally vague," citing many of the cases upon which the parties in this action addressed in their briefing. *Id.* at 2325–36. Thus, § 924(c)(3)'s residual clause is void.

Accordingly, defendant's convictions under § 924(c) can only stand if Hobbs Act robbery is a "crime of violence" within the meaning of § 924(c)(3)'s element clause. The applicable statute, 18 U.S.C. § 1951(b)(1), defines "robbery" as

> the unlawful taking or obtaining of personal property from the person or in the presence of another, against his will, by means of actual or threatened force, or violence, or fear of injury, immediate or future, to his person or property, or property in his custody or possession, or the person or property of a relative or member of his family or of anyone in his company at the time of the taking or obtaining.

Here, defendant argues that his conviction of interference with commerce by robbery in violation of 18 U.S.C. § 1951(a) does not constitute a crime of violence under § 924(c)'s elements clause because the full range of conduct encompassed by § 1951(a) is significantly broader than the conduct required to satisfy the elements clause. (Doc. No. 134 at 13–14.) This issue,

however, was also recently resolved by the Ninth Circuit. In light of the holdings in *Johnson II* and *Davis*, the Ninth Circuit explicitly reiterated its previous holding that "Hobbs Act robbery is a crime of violence under 18 U.S.C. § 924(c)(3)(A)." *United States v. Dominguez*, 954 F.3d 1251, 1261 (9th Cir. 2020) (reviewing *Johnson II* and *Davis*). As such, "*Dominguez* wholly undercuts and forecloses [defendant Sanchez's] argument." *Summerise v. United States*, No. 1:13-cr-0008 AWI, 2020 WL 3257390, at \*2 (E.D. Cal. June 16, 2020); *see also United States v. Lott*, 834 Fed. App'x. 370 (9th Cir. 2021)[5] ("Lott's contention that Hobbs Act robbery, 18 U.S.C. § 1951, is not a crime of violence for purposes of 18 U.S.C. § 924(c)(3)(A) is foreclosed."). Thus, defendant's convictions under § 924(c) must stand because, according to binding Ninth Circuit authority, Hobbs Act robbery is a "crime of violence" within the meaning of § 924(c)(3)(A). Defendant's motion to vacate his sentence pursuant to 28 U.S.C. § 2255 must therefore be denied.

However, the court will grant the issuance of a certificate of appealability. A movant cannot appeal from the denial or dismissal of his § 2255 motion unless he has first obtained a certificate of appealability. *See* 28 U.S.C. § 2253(c); Fed. R. App. P. 22(b). To obtain a certificate of appealability under 28 U.S.C. § 2253(c), a movant "must make a substantial showing of the denial of a constitutional right, . . . includ[ing] showing that reasonable jurists could debate whether (or, for that matter, agree that) the [motion] should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Slack v. McDaniel*, 529 U.S. 473, 483–84 (2000) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)). "The Supreme Court has made clear that the application of an apparently controlling rule can nevertheless be debatable for purposes of meeting the *Barefoot* standard in several cases." *Lambright v. Stewart*, 220 F.3d 1022, 1025 (9th Cir. 2000). For example, "in *Slack*, the Supreme Court [] held that an issue apparently settled by the law of our circuit remained debatable for purposes of issuing a COA." *Id.* at 1026.

In this case, the court should allow defendant Sanchez to "persuade [the Ninth Circuit] through full briefing and argument to reconsider" the decision in *Dominguez*. *Id.* This is

---

[5] Citation to this unpublished Ninth Circuit opinion is appropriate pursuant to Ninth Circuit Rule 36-3(b).

because, just days prior to the issuance of this order, the United States Supreme Court granted

writ of certiorari in *United States v. Taylor*, a case in which the Fourth Circuit had held that

Hobbs Act robbery does *not* qualify as a "crime of violence" under § 924(c). *United States v.*

*Taylor*, 979 F.3d 203, 205 (4th Cir. 2020), *cert. granted sub nom. United States v. Taylor, Justin*

*E.*, No. 20-1459, 2021 WL 2742792 (U.S. July 2, 2021). This development supports a finding

that reasonable jurists could debate that defendant Sanchez's basis for requesting relief can be

relitigated in this § 2255 proceeding. *Cf. Lambright*, 220 F.3d at 1029 ("We decline to grant a

COA on the issue of whether Arizona's aggravating factor is unconstitutionally vague" because

"the Supreme Court explicitly upheld the aggravating factor against the same challenge

petitioners make here [and] Petitioners do not suggest anything that would make the authority

debatable."). Accordingly, the court will issue a certificate of appealability.

## B.      Defendant Sanchez's 18 U.S.C. § 3582(c) Motion

As district courts have summarized, in analyzing whether a defendant is entitled to

compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i), the court must determine whether a

defendant has satisfied three requirements:

> First, as a threshold matter, the statute requires defendants to exhaust
> administrative remedies. 18 U.S.C. § 3582(c)(1)(A). Second, a
> district court may grant compassionate release only if "extraordinary
> and compelling reasons warrant such a reduction" and "that such
> reduction is consistent with applicable policy statements issued by
> the Sentencing Commission. *Id.* Third, the district court must also
> consider "the factors set forth in Section 3553(a) to the extent that
> they are applicable." *Id.*

*United States v. Rodriguez*, 424 F. Supp. 3d 674, 680 (N.D. Cal. 2019); *see also United States v.*

*Ramirez-Suarez*, No. 16-cr-00124-LHK-4, 2020 WL 3869181, at *2 (N.D. Cal. July 9, 2020);

*United States v. Parker*, 461 F. Supp. 3d 966, 970 (C.D. Cal. 2020); *United States v. Trent*, No.

16-cr-00178-CRB-1, 2020 WL 1812242, at *2 (N.D. Cal. Apr. 9, 2020) (noting that as to the third

factor, under 18 U.S.C. § 3582(c)(1)(A) release must be "consistent with" the sentencing factors

set forth in § 3553(a)).

/////

/////

1        1.    *Administrative Exhaustion*

2            Defendant asserts that he exhausted his administrative remedies prior to filing the pending

3    motion for relief under § 3582, representing that on July 7, 2020, he submitted a request for a

4    sentence reduction to the warden of FCI Fairton.  (Doc. No. 143 at 20.)  As of September 25,

5    2020, defendant reported to defense counsel that he had not yet received a response to this

6    request.  (*Id.*) (citing Doc. No. 143-10 at ¶ 3).

7            In the government's opposition to the pending motion, it states that defendant has not

8    exhausted his remedies.  (Doc. No. 151 at 17–18.)  The government asserts that defendant must

9    "make a request to the Warden and must wait until 30-days have elapsed from the time the

10   request was received by the Warden before his claim," and "[u]ntil that happens, this Court lacks

11   authority to grant relief."  (*Id.* at 18.)

12           In defendant's reply, he states that "as the government attempted to locate his first

13   request, . . . his counselor advised him to complete another one, this time with [the counselor's]

14   assistance."  (Doc. Nos. 160 at 3; 160-1 at 15–16.)  Defendant has attached to his reply brief a

15   request for compassionate release submitted by him to the warden that is dated October 29, 2020.

16   (Doc. No. 160-1 at 16.)  Defense counsel also states that as of December 9, 2020 when she last

17   spoke to defendant, the BOP had not replied to the October 29, 2020 request.  (Doc. No. 160 at 3–

18   4.)

19           In cases where the filing of an otherwise meritorious motion for compassionate release

20   precedes administrative exhaustion, some courts have stayed compassionate release until 30 days

21   have lapsed from the BOP's receipt of the unanswered request.  *See United States v. Krashna*,

22   465 F. Supp. 3d 988, 991 (N.D. Cal. 2020) (staying compassionate release pending exhaustion);

23   *United States v. Reid*, No. 17-cr-00175-CRB-1, 2020 WL 1904598, at *4 (N.D. Cal. Apr. 18,

24   2020) (same); *United States v. Route*, 458 F. Supp. 3d 1285, 1290 (W.D. Wash. 2020) ("[T]he

25   Court finds that a stay best favors the interests of judicial economy in this instance.").  However,

26   no such stay is necessary here because 30 days have already long since lapsed since defendant

27   Sanchez filed his October 29, 2020 compassionate release request to the Warden at FCI Fairton

28   and no reply was received in response to the request.  Thus, while it may be somewhat unclear

whether defendant initially satisfied the administrative exhaustion requirement by way of his request allegedly submitted to the warden on July 7, 2020, defendant has clearly satisfied the requirement by way of his subsequent submission of his administrative request in October of 2020. Accordingly, the court finds that defendant has exhausted his administrative remedies and will address the merits of his motion below.

2. *Extraordinary and Compelling Reasons*

According to the Sentencing Commission's policy statement, "extraordinary and compelling reasons" warranting compassionate release may exist based on a defendant's medical conditions, age and other related factors, family circumstances, or "other reasons." U.S.S.G. § 1B1.13, cmt. n.1 (A)–(D). As addressed above, even though the catch-all of "other reasons" was included in the policy statement at a time when only the BOP could bring a compassionate release motion, courts have agreed that it may be relied upon by defendants bringing their own motions for reductions in their sentence under the FSA. *See, e.g.*, *United States v. Kesoyan*, No. 2:15-cr-00236-JAM, 2020 WL 2039028, at *3–4 (E.D. Cal. Apr. 28, 2020) (collecting cases.) Moreover, in light of the Ninth Circuit's decision in *Aruda*, while U.S.S.G. § 1B1.13 may inform its determination, this court is not restricted thereby and instead has "full discretion to define 'extraordinary and compelling' without consulting the policy statement § 1B1.13." *United States v. Jones*, 980 F.3d at 1111.

Here, defendant Sanchez's grounds for seeking compassionate release are based in part on (1) the purported risks posed to him by the coronavirus ("COVID-19") pandemic; and (2) the FSA's clarification that federal prosecutors may no longer seek stacked sentences for multiple § 924(c) convictions in a single prosecution, as they did in his case. The court will consider each argument in turn.

a. <u>Whether Defendant's Medical Condition Warrants Compassionate Release</u>

The medical condition of a defendant may warrant the granting of compassionate release by the court where the defendant "is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory)," though "[a] specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required." U.S.S.G. § 1B1.13, cmt.

n.1(A)(i).  Non-exhaustive examples of terminal illnesses that may warrant a compassionate

release "include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage

organ disease, and advanced dementia."  *Id*.  In addition to terminal illnesses, a defendant's

debilitating physical or mental condition may warrant compassionate release, including when:

> The defendant is
>
> (I)   suffering from a serious physical or medical condition,
>
> (II)  suffering from a serious functional or cognitive impairment, or
>
> (III) experiencing deteriorating physical or mental health because of
> the aging process,
>
> that substantially diminishes the ability of the defendant to provide
> self-care within the environment of a correctional facility and from
> which he or she is not expected to recover.

*Id*. at cmt. n.1(A)(ii).  Where a defendant has moderate medical issues that otherwise might not be

sufficient to warrant compassionate release under ordinary circumstances, many courts have

concluded that the risks posed by COVID-19 may tip the scale in favor of release when the

particular circumstances of a case are considered in their totality.  *See, e.g.*, *United States v.*

*Parker*, 461 F. Supp. 3d at 980 ("Since the onset of the COVID-19 pandemic, courts have

determined that inmates suffering from conditions such as hypertension and diabetes are now at

an even greater risk of deteriorating health, presenting 'extraordinary and compelling'

circumstances that may justify compassionate release.") (collecting cases); *United States v.*

*Rodriguez*, 451 F. Supp. 3d 392, 405 (E.D. Pa. 2020) ("Without the COVID-19 pandemic—an

undeniably extraordinary event—Mr. Rodriguez's health problems, proximity to his release date,

and rehabilitation would not present extraordinary and compelling reasons to reduce his sentence.

But taken together, they warrant reducing his sentence.").

Compassionate release may also be warranted based on a defendant's age and other

related factors.  Thus, "extraordinary and compelling reasons" exist where a "defendant (i) is at

least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because

/////

/////

14

of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less." U.S.S.G. § 1B1.13, cmt. n.1(B).[6]

Here, defendant Sanchez argues that extraordinary and compelling reasons warranting his compassionate release exist because he is at high risk of suffering a severe illness if he were to contract COVID-19 due to the multiple health conditions from which he suffers. (Doc. Nos. 143 at 43; 160 at 8–11.) Defendant argues that he is morbidly obese to the point where he is restricted to the lower bunk, must wear an abdominal binder because his muscles are not able to sustain proper body form, and has been prescribed a cane. (Doc. No. 143 at 42.) As recorded on April 16, 2020, defendant has a body mass index (BMI) of 43.5. (*Id.*) (citing Doc. No. 148 at 25—sealed). Additionally, defendant argues that he suffers from hypertension, retinopathy, and peripheral vascular disease, among other conditions. (*Id.*) (citing Doc No. 148 at 19–20—sealed). Defendant asserts that he has been hospitalized several times in the last few years for a variety of health issues, including bradycardia, hernias, cysts, and abscesses. (*Id.* at 42–43.) The government concedes that defendant "Sanchez's medical history demonstrates that he meets the threshold criteria for consideration for compassionate release under section 1B1.13 of the Guidelines . . . because Sanchez's medical records demonstrate that he suffers from severe obesity and hypertension." (Doc. No. 151 at 20.)

It is undisputed that according to the CDC, "[a]dults of any age" who have certain medical conditions, including obesity with a BMI of 30 or higher, are "more likely to get severely ill from COVID-19," and hypertension in adults "can make [them] more likely to get severely ill from COVID-19." *See Medical Conditions*, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last updated May 13, 2021). Defendant's medical records confirm that he suffers from morbid obesity, hypertension, and bradycardia. (*See* Doc. No. 148—sealed.) Defendant has shown that because he suffers from these medical conditions, he is at an increased risk for suffering severe illness if he were to be infected with COVID-19.

---

[6] Here, however, because defendant Sanchez is only 49 years old (*see* PSR at 2), his age and age-related factors do not play a role in consideration of his pending motion.

15

However, defendant Sanchez has not shown that he is unable to provide self-care.  As an initial matter, and as stated above, defendant is currently serving his sentence in a halfway house in Oakland, California.  Defendant has not shown, or even argued for the matter, he is presently unable to self-care while he is housed at his current location.  Moreover, it is unclear whether there is any chance of defendant being relocated back to FCI Fairton.  However, even if he were returned to that prison, defendant has not argued that FCI Fairton was unable to monitor and adequately treat his medical conditions.  Defendant Sanchez has not updated the court as to whether he is receiving adequate medical care in the halfway house.  His BOP medical records suggest that FCI Fairton provided him adequate medical care because he was prescribed and provided the medications necessary for his health conditions, such as his hypertension.  (*See* Doc. No. 148—sealed.)  Other conditions, such as his morbid obesity and bradycardia, were tracked and monitored.  (*See id.*); *United States v. Ayon-Nunez*, No. 1:16-cr-00130-DAD, 2020 WL 704785, at *3 (E.D. Cal. Feb. 12, 2020) ("Chronic conditions that can be managed in prison are not a sufficient basis for compassionate release.") (internal quotation marks and citation omitted); *United States v. McCollough*, No. 15-cr-00336-001-PHX-DLR, 2020 WL 2812841, at *2 (D. Ariz. May 29, 2020) (relevant questions include the adequacy of the care and treatment being provided to the defendant in BOP given his pre-existing conditions and concluding there was no evidence that the circumstances surrounding his health or treatment were extraordinary or compelling.).

As one court has acknowledged, "the presence of COVID 19 . . . necessitates a more expansive interpretation of what self-care means" and thus the inability of individuals at high risk of becoming severely ill from COVID-19 to practice appropriate hygiene, wear a mask and maintain social distancing may constitute an inability to provide self-care under some circumstances.  *United States v. Gorai*, No. 2:18-cr-00220-JCM, 2020 WL 1975372, at *3 (D. Nev. April 24, 2020)) (citation omitted).  However, here, defendant Sanchez has not persuasively argued that he is being prohibited from taking appropriate precautions to avoid contracting COVID-19 or that his ability to provide self-care is currently substantially diminished.  Defendant Sanchez has also not made any specific allegations regarding, for instance, his lack of access to

protective gear or cleaning and sanitizing supplies, or as to his lack of ability to social distance. Rather, he merely stated in a September 2020 letter to the court that there was no social distancing at FCI Fairton. (Doc. No.143-7 at 2.) Despite this conclusory assertion, defendant has not presented any evidence regarding the conditions that he is currently facing, or the ways in which those conditions render him unable to provide self-care.

Additionally, when the government filed its opposition to the pending motion on November 18, 2020, FCI Fairton was reporting zero active cases of COVID-19 among the inmates there. (Doc. No. 160 at 12.) Defendant notes, however, that as of December 15, 2020, there were 17 inmates being reported as having COVID-19, and as of December 18, 2020, there were 22 inmates who had then tested positive. (*Id.* at 9.) As of the date of this order on July 6, 2021, the BOP was reporting that FCI Fairton once again had zero inmates and two staff members with active positive tests for COVID-19, 249 inmates and 75 staff members have previously tested positive for the virus and recovered, and one inmate has passed away due to COVID-19.[7] *See* Federal Bureau of Prisons, COVID-19 Coronavirus, available at https://www.bop.gov/coronavirus/ (last visited July 6, 2021).[8] Thus, the situation at FCI Fairton has obviously improved. Moreover, aside from conclusory statements addressing the subject, defendant Sanchez has not provided evidence of the conditions of his confinement in FCI Fairton nor has he even claimed that they are such that it hinders his ability to provide self-care for his hypertension or obesity. Rather, defendant merely asserts in conclusory fashion that "forced living in a communal setting such as the BOP . . . increase[s] the possibility that [he] will contract the disease." (Doc. No. 160 at 11.) Based on the evidence currently before the court at this time, there is no basis upon which to find that the medical staff at FCI Fairton would be unable to adequately monitor and care for defendant Sanchez even should he return to FCI Fairton. Finally, /////

---

[7] FCI Fairton has a total population of 880 inmates. FCI Fairton, FEDERAL BUREAU OF PRISONS, https://www.bop.gov/locations/institutions/fai/ (last visited July 6, 2021).

[8] While the undersigned does not necessarily accept these reported numbers at face value in light of current CDC guidelines with respect to both testing and the manner of counting "active cases," there is also no evidence before the court challenging those reported numbers in this case.

1    and most importantly, defendant Sanchez has not claimed that he is at significant risk of

2    contracting COVID-19 at the halfway house in Oakland where he is now serving his sentence.

3         Accordingly, defendant has not shown that his medical conditions constitute extraordinary

4    and compelling reasons for compassionate release under § 3582(c)(1)(A).

5              b.    Whether Defendant's Sentencing Disparity Warrants Compassionate

6                    Release

7         As noted above, while U.S.S.G. § 1B1.13 may inform its determination, this court is not

8    restricted thereby and instead has "full discretion to define 'extraordinary and compelling'

9    without consulting the policy statement § 1B1.13." *United States v. Jones*, 980 F.3d at 1111; *see*

10   *also Aruda*, 993 F.3d at 802.  Therefore, now "the list of examples of extraordinary and

11   compelling reasons in [U.S.S.G.] § 1B1.13 (i.e., medical condition of the defendant, age of the

12   defendant, family circumstances, and other reasons) is not exclusive." *United States v. Parker*,

13   No. 2:97-cr-00202-TLN-EFB, 2021 WL 1966409, at *2 (E.D. Cal. May 17, 2021).

14        In his motion, defendant Sanchez argues that extraordinary and compelling reasons

15   warranting his release exist because the FSA clarified that federal prosecutors may not stack

16   sentences for multiple § 924(c) convictions in a single prosecution, as they did in his case over 25

17   years ago.  (Doc. No. 143 at 33.)  Defendant asserts that under the FSA his exposure for the

18   § 924(c) charges the government brought against him would have dropped from 145 years to 40

19   years; his actual exposure on the § 924(c) counts he was convicted would have dropped from 25

20   years to 10 years; and he has already served over 25 years in custody.  (*Id.*)  Defendant argues

21   that § 3582(c)(1)(A) now essentially provides a safety valve for situations precisely like this and

22   points to cases across the country where defendants have been granted relief from their previously

23   imposed stacked § 924(c) sentences pursuant to § 3582.  (*Id.* at 33, 34–38) (citing cases).

24        In opposition, the government contends that "[t]he sentencing court correctly applied

25   § 924(c) to Sanchez's case when it sentenced him in 1995."  (Doc. No. 151 at 22.)  The

26   government asserts that defendant is effectively seeking the retroactive application of § 403, and

27   notes that Congress instead explicitly provided that § 403 "shall apply to any offense that was

28   committed before the date of enactment of this Act, if a sentence for the offense has not been

18

imposed as of such date of enactment." (*Id.* at 24.) Additionally, the government argues that the remedy sought by defendant would enable judges to impose mandatory sentences as dictated by Congress and, after the judgment became final, reduce it upon a declaration that imposition of the sentence in the particular case is extraordinary and unwarranted. (*Id.* at 28.) The government asserts that permitting such an application of § 3582 would inevitably result in varying determinations by different courts, undermining the certainty and consistency in sentencing that Congress required through passage of the Sentencing Reform Act. (*Id.*)

In reply, defendant argues that the issues raised here are exactly what Congress envisioned when it passed § 3582(c)(1)(A) as evidenced by its subsequent passage of the FSA. (Doc. No. 160 at 6.) Defendant discounts the government's assertion that a court could impose a mandatory sentence one day and immediately thereafter reduce it as unwarranted, because a court is still only permitted to grant a reduction in sentence when it finds that an extraordinary and compelling circumstance exists and where reducing the sentence would be consistent with consideration of the § 3553(a) factors, which direct courts to avoid unwarranted disparities between defendants convicted of similar conduct. (*Id.* at 7.)[9]

The court is persuaded by defendant's arguments. First, while the government is correct that § 403 does not apply in defendant's case because he was sentenced before December 21, 2018, it is also true that this court may nonetheless consider that legislative change in determining whether extraordinary and compelling reasons exist supporting the granting of defendant's motion to reduce his sentence under § 3582(c)(1)(A). *United States v. Parker*, 2021 WL 1966409, at *3 (citing *United States v. Jones*, 482 F. Supp. 3d 969, 976 (N.D. Cal. 2020); *United States v. Quinn*, 467 F. Supp. 3d 824, 830–31 (N.D. Cal. 2020); *U.S.A. v. Defendant(s)*, No. 2:99-cr-00257-CAS-3, 2020 WL 1864906, at *5–6 (C.D. Cal. Apr. 13, 2020); *United States v. Ngo*, No. 97-cr-3397-GPC, 2021 WL 778660, at *5 (S.D. Cal. Mar. 1, 2021)).

/////

---

[9] Because the parties' briefing predates the Ninth Circuit's holding in *Aruda*, many of their remaining arguments have been rendered moot because the court is no longer restricted by the policy statement at U.S.S.G. § 1B1.13. (*See* Doc. Nos. 151 at 22–24, 26–29; 160 at 4–6.)

Additionally, defendant is correct that "[s]ection 3582 (c)(1)(A) provides a safety valve against what otherwise would be a harsh, unjust, and unfair result stemming from a non-retroactivity clause." *United States v. McPherson*, 454 F. Supp. 3d 1049, 1053 (W.D. Wash. 2020). In this regard, many district courts have now specifically held "that a sentencing disparity created by changes to the law on sentencing that gives rise to an injustice of facing a term of incarceration longer than what Congress currently deems warranted for the crimes at issue constitutes an extraordinary and compelling reason for reducing a sentence under § 3582(c)(1)(A)." *United States v. Blanco*, No. 93-cr-20042-2 CW, 2020 WL 7350414, at *6 (N.D. Cal. Dec. 14, 2020); *see also United States v. Parker*, 2021 WL 1966409, at *3; *United States v. McGee*, No. 12-cr-00052-EMC-1, 2021 WL 1660251, at *1 (N.D. Cal. Apr. 26, 2021); *United States v. Gloria Blancas de Hernandez*, No. 17-cr-2110-MMA, 2021 WL 2290778, at *3 (S.D. Cal. June 4, 2021). This court joins those other district courts that have specifically found that the enactment of the FSA and its elimination of the government's ability to "stack" sentences for multiple § 924(c) charges may constitute an extraordinary and compelling reason that warrants the granting of compassionate release in a particular case. *See, e.g.*, *United States v. Parker*, 2021 WL 1966409, at *3; *United States v. Jones*, No. 94-cr-20079-EJD, 2020 WL 5359636, at *7 (N.D. Cal. Aug. 27, 2020) (finding that "changes in sentencing law weigh strongly in favor of compassionate release" where "Mr. Jones was sentenced under a regime that has not only been held unconstitutional but has also been substantially amended to eliminate the brutal harshness of stacking"); *United States v. Gaines*, No. 2:99-cr-00257-CAS-1, 2020 WL 4060552, at *4 (C.D. Cal. July 20, 2020) ("The FSA's amendments to the § 924(c) enhancement may, in conjunction with other factors such as age, medical need, and evidence of exemplary rehabilitation, provide extraordinary and compelling reasons that justify compassionate release."); *McPherson*, 454 F. Supp. 3d 1049.

Here, defendant Sanchez "ha[s] already served over 25 years in prison, more than half his life." *United States v. Jones*, 2020 WL 5359636, at *7 (noting the 15 year disparity between the defendant's sentence and the sentence that would have likely been imposed today); (*see also* Doc. No. 143 at 33) ("[T]he § 924(c) charges the government alleged dropped from 145 years to 40

20

years, [and] his actual exposure on the § 924(c) counts he was actually convicted of dropped from 25 years to 10 years.").  The court finds that the disparity between the sentence that defendant Sanchez is currently serving and the one that would have been imposed had he been sentenced today is an extraordinary and compelling reason that warrants a sentence reduction in this case when considered with defendant's efforts at rehabilitation while imprisoned, as addressed below. *See Parker*, 2021 WL 1966409, at *3.

Accordingly, the court concludes that defendant has met his burden of demonstrating that extraordinary and compelling reasons exist that warrant the granting of compassionate release under § 3582(c)(1)(A).

3.      *Consistency With the § 3553(a) Factors*

As discussed above, "changes to § 924(c) can be one of any number of 'extraordinary and compelling reasons' to grant a motion for compassionate release, if a defendant's individual characteristics support that finding." *United States v. Smith*, No. 2:98-cr-00009-KJM-CKD, 2021 WL 1890770, at *7 (E.D. Cal. May 11, 2021).  Thus, any relief to be granted pursuant to 18 U.S.C. § 3582(c)(1)(A) must be consistent with consideration of the sentencing factors set forth in 18 U.S.C. § 3553(a).[10]  *See United States v. Parker*, 461 F. Supp. 3d at 979.  Here, consideration of the § 3553(a) sentencing factors support defendant's release.

Defendant Sanchez is currently serving a 363-month sentence of imprisonment for interference with commerce by robbery and use of a firearm during a crime of violence and aiding and abetting.  (Doc. No. 134-1, Ex. C.)  Although defendant Sanchez had no history of

---

[10]  Title 18 U.S.C. § 3553(a) provides that, in determining the sentence to be imposed, the court shall consider:  the nature and circumstances of the offense and the history and characteristics of the defendant; the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, afford adequate deterrence, protect the public from further crimes of the defendant and provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; the kinds of sentences available; the kinds of sentence and the sentencing range established for the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines; any pertinent policy statement issued by the Sentencing Commission; the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and the need to provide restitution to any victims of the offense.

adult criminal convictions prior to his convictions in this case he had suffered three juvenile adjudications. (Doc. No. 156 at 13–14—sealed.) With his early acceptance of responsibility, the U.S. Probation Office determined that defendant's total offense level was 26 and that his criminal history placed him in criminal history category I. (*Id.* at 19.) Defendant's offense level and criminal history category resulted in an advisory sentencing guideline range calling for a term of imprisonment of between 63 to 78 months as to Counts One, Five, Seven, Nine, and Thirteen. (PSR at 20.) The U.S. Probation Office also noted that Count Two carried a mandatory five-year consecutive sentence and that Count Six carried a mandatory 20-year consecutive sentence. (*Id.*) The probation officer recommended a low-end of the guideline range sentence as to Counts One, Five, Seven, Nine, and Thirteen, and also recommended that the 5 and 20-year mandatory consecutive sentence be imposed as to Counts Two and Six, use of a firearm during the commission of a crime of violence. (*Id.* at 19–21.) Senior United States District Judge Edward Price followed that recommendation and sentenced defendant to an aggregate term of 363-months in the custody of the BOP. (Doc. No. 71 at 2.)

In defendant's pending motion, he notes that his co-defendant, Gilbert Chavez, was charged with five counts of Hobbs Act robbery and five counts of violating § 924(c), and his exposure on the § 924(c) counts alone was 85 years. (Doc. No. 143 at 12.) Defendant Chavez was sentenced to 16.5 years in federal custody and was released on September 2, 2009. (*Id.*) Defendant Sanchez notes that his criminal conduct spanned roughly the same few weeks as defendant Chavez's, not counting a 1992 gas station robbery that he committed. (*Id.*)

Defendant also recounts his challenging upbringing with alcoholic and drug addicted parents and argues that he has matured into a productive citizen since his imprisonment. (*Id.* at 39.) He expresses a desire to continue his prior volunteer work with youth, as well as aspiring law students, to use his own life experience as a vehicle for improving the lives of others. (*Id.* at 40.) Additionally, defendant Sanchez earned his GED while in BOP custody. According to defendant, he then spent many years working in UNICOR—"a wholly owned, self-sustaining Government corporation that sells market-priced services and quality goods made by inmates" and is "a vital correctional program that assists offenders in learning the skills necessary to

successfully transition from convicted criminals to a law-abiding, contributing members of society"—at three different facilities until his health deteriorated.  (*Id.*)  Defense counsel contends that BOP studies show that inmates who participate in this program are 24 percent less likely to revert to criminal behavior as much as 12 years following release and 14 percent more likely to be gainfully employed following release from prison.  (*Id.*)  Given his physical limitations, as of October 23, 2020, defendant Sanchez was employed as an orderly at the prison where he was then incarcerated.  (*Id.* at 41.)  Defendant also notes that he has engaged in various educational and personal enrichment courses while incarcerated, including anger management; numerous arts, literature, and history classes, as well as algebra and biology; poetry; chapel and recreation center programs; and basic keyboarding.  (*Id.*) (citing Doc. Nos. 143-7, 143-8).  Two of defendant's poems are included in a letter he has provided to the court.  (*Id.*) (citing Doc. No. 143-7 at 3).

Defendant argues that while his prison disciplinary summary in his progress report indicates that he has "a history of incident reports," it also notes that "he is not a management concern at this time."  (*Id.* at 41) (citing Doc. No. 143-8 at 2).  Defendant explains that the last prison disciplinary incident he had involving violence was in 2009 when, 3 years after he dropped out of a gang, he was transferred to FCC Terre Haute and placed on an active yard where he was promptly attacked.  (*Id.*)  The BOP then moved him to a non-active yard and, according to defendant, he has not been involved in any altercations involving physical injuries for the past 12 years.  (*Id.*)  Defendant has, however, continued to struggle with drugs.  (*Id.*)  Defendant contends that because of his convictions he is "not able to complete the Residential Drug Abuse Program" while in BOP custody.  (*Id.* at 41–42.)  Accordingly, defendant expresses his intention to obtain drug treatment following his release from prison, in addition to medical care for his aforementioned health conditions.  (*Id.*)

Finally, defendant has noted his family support and outlined additional aspects of his release plan.  (*Id.* at 44.)  Upon his release from custody, defendant intends to live with his sister at her apartment.  (*Id.*) (citing Doc. No. 143-6).  Defendant has another sister who is a retired highway patrol officer and who is committed to providing defendant with the necessary financial and emotional support, including driving him to his appointments to facilitate his re-entry back

into the community. (*Id.*) (citing Doc. No. 143-9). Both of defendant's sisters have maintained contact with him throughout his incarceration and believe he has grown during his imprisonment into a thoughtful adult who has worked hard to be positive and productive notwithstanding his protracted incarceration. (*Id.*) Immediately upon release, defendant intends to focus on stabilizing his mental and physical health, including seeking drug treatment. (*Id.*) Defendant also intends to work in the community, using the skills he acquired during his years of working at three different UNICOR facilities. (*Id.*) Defendant states that he is inspired by the success that defendant Chavez has achieved as a truck driver following his release from prison in 2009. (*Id.*) Defendant Chavez has indicated to counsel that, if permitted, he will assist defendant Sanchez in obtaining the necessary licenses to pursue a career as a truck driver if defendant decides to do so. (*Id.* at 44–45) (citing Doc. No. 143-10 at ¶ 2). Defendant states that his long-term dream is to open a small business detailing cars and trucks, and possibly one day open a family restaurant. (*Id.* at 45) (citing Doc. No. 143-7).

The government counters that a reduction of defendant's sentence would not be consistent with consideration of the § 3553(a) sentencing factors. (Doc. No. 151 at 21–22.) The government argues that defendant's history and characteristics demonstrate that he is a violent criminal, noting that from late 1992 through early 1995 defendant "wreaked havoc throughout Fresno as he and others carried out takeover-style armed robberies of various businesses." (*Id.* at 21.) The government argues that defendant took control of premises and their occupants by ordering everyone to the ground and then instilled fear in his victims by holding them at gunpoint and threatening to shoot cashiers and patrons if cash was not handed over quickly. (*Id.*) Defendant also discharged his weapon during a robbery of a Save Mart Supermarket on January 12, 1995. (*Id.*) (citing PSR at ¶ 54). The government contends that "[t]he circumstances surrounding these violent crimes suggest that they were thoughtfully planned out, which Sanchez admitted." (*Id.*) (citing PSR at ¶ 22). Moreover, the government emphasizes defendant's prison disciplinary history during his imprisonment, noting that since 1998, defendant has been disciplined more than 20 times for rules violations that include 3 incidents of assaulting another inmate, twice with serious injury and once without serious injury; an incident of possession of a

24

dangerous weapon; 7 incidents of use of drugs; 5 incidents of refusing to obey orders or otherwise being insolent to staff; and 4 incidents of phone abuse. (*Id.* at 22) (citing Doc. No. 151-1, Ex. 4). The government also argues that defendant's continued substance abuse, which is reflected in his prison disciplinary record, weighs against his release because "it was primarily Sanchez's PCP addiction that drove him to commit the armed robberies of which he stands convicted." (*Id.*) (citing Doc. No. 151-1, Ex. 4).

In defendant's reply, he adds that courts across the country are granting relief to similarly situated defendants—largely minorities who, like himself, committed Hobbs Act robberies or bank robberies in their early twenties but had no prior adult convictions. (Doc. No. 160 at 9–11) (listing cases).

The court acknowledges the seriousness of defendant's prison disciplinary infractions over the many years of his imprisonment. However, these infractions do not necessarily preclude the granting of compassionate release, particularly where defendant intends to participate in drug rehabilitation following his release. *See United States v. Nieves-Lopez*, No. 2:19-cr-37-KJM, 2021 WL 147134, at *4 (E.D. Cal. Jan. 15, 2021) ("The majority of Mr. Nieves-Lopez's crimes and disciplinary infractions are nonviolent and a number appear to be related to the substance abuse issues he says he will be seeking treatment for once back in Mexico with the support of his family. On this record, the court finds he is not a danger.") (internal citation omitted); *United States v. Neal*, No. 2:09-cr-00089-JAM-KJN, 2020 WL 4476718, at *3 (E.D. Cal. Aug. 4, 2020) (granting release despite expressing concern that defendant played a role in "two in-custody assaults over the past four years" because "viewing [defendant's] record as a whole," "the steps she's taken toward self-reflection and rehabilitation paint a more accurate picture of her time in prison than do the missteps she's made along the way"); *United States v. Parmer*, No. 3:18-cr-00267-RS-1, 2020 WL 2213467, at *2 (N.D. Cal. Apr. 14, 2020) (granting compassionate release in part because defendant had avoided disciplinary issues over the past eight months and his placement at a dual-diagnosis facility would address the cause of his prior infractions: drug use and difficulty coexisting with his roommate). *But see United States v. Smith*, No. 2:04-cr-00472-GEKP-1, 2020 WL 7353891, at *5 (E.D. Pa. Dec. 15, 2020) (denying compassionate release and

25

concluding that defendant "ha[d] not seriously made a substantive or in-depth attempt at rehabilitation" where, in the past five years, he had "incurred infractions for possessing unauthorized items on several occasions, possessing marijuana paraphernalia and use of marijuana, possession of non-hazardous tool, and use of drugs and alcohol"). The court also notes that it has been approximately 12 years since defendant's last disciplinary incident involving violence, and BOP has opined that defendant was not a management concern which is consistent with the programming in which he has been allowed to participate. (*See* Doc. No. 143-8.)

Although the government asserted at the June 30, 2021 hearing on the present motion that defendant is essentially the same person that was sentenced over two decades ago, the court disagrees. Defendant Sanchez has now spent over half his lifetime in prison. During that time, he has engaged in many rehabilitation efforts. While the court also acknowledges that rehabilitation alone is not enough to warrant compassionate release, *see* 28 U.S.C. § 994(t); U.S.S.G. § 1B1.13, cmt. n.3, the court is persuaded that this defendant has made sincere and serious efforts in that regard.

Finally, "'[t]he length of the sentence remaining is an additional factor to consider in any compassionate release analysis,' with a longer remaining sentence weighing against granting any such motion." *United States v. Shayota*, No. 1:15-cr-00264-LHK-1, 2020 WL 2733993, at *6 (N.D. Cal. May 26, 2020) (quoting *United States v. Connell*, No. 18-cr-00281-RS-1, 2020 WL 2315858, at *6 (N.D. Cal. May 8, 2020)); *see also United States v. Lonich*, No. 1:14-cr-00139-SI-1, 2020 WL 2614874, at *3 (N.D. Cal. May 21, 2020) (denying motions for compassionate release, noting, "the Court finds it significant that defendants have served far less than half of their sentences"). Here, as of the date of this order, defendant Sanchez has served 317 months of his 363-month sentence, or approximately 87.33 percent of the sentence imposed. (*See* Doc. No. 151-1, Ex. 1.) As recognized above, it is currently anticipated he will be released from the halfway house on February 5, 2022 and thus has served practically all of the lengthy prison term imposed in his case—one that would not be imposed today. (*See id.*) As his counsel noted at the hearing on the motion, defendant was granted the full amount of halfway house time by the BOP

and is therefore already in the community. The court agrees that seven additional months in a halfway house will serve no purpose in this case.

Accordingly, in the undersigned's view, serving 25 years in prison, and now a halfway house, clearly reflects the seriousness of defendant's offenses of conviction, is sufficient to promote respect for the law, and provides just punishment while also affording adequate deterrence to criminal conduct. *See United States v. Purry*, No. 2:14-cr-00332-JAD-VCF, 2020 WL 2773477, at *2 (D. Nev. May 28, 2020); *Shayota*, 2020 WL 2733993 at *5; 18 U.S.C. § 3553(a)(2)(A), (B). For these reasons, the court finds that the granting of defendant's motion for compassionate release is consistent with the sentencing factors set forth in §3553(a).

**CONCLUSION**

Accordingly:

1.     Defendant Sanchez's motion to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255 (Doc. No.134) is denied;

2.     The court grants the issuance of a certificate of appealability under 28 U.S.C. § 2253(c) as to the issue presented in defendant Sanchez's § 2255 motion;

3.     Defendant Sanchez's motion for compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A) (Doc. No. 143) is granted;

4.     Defendant Sanchez's sentence is reduced to one of time served and he is to be released immediately from the custody of the Bureau of Prisons; and

5.     Defendant Sanchez shall be immediately released to begin his term of supervised release with all of the amended special and standard conditions as listed below.

IT IS SO ORDERED.

Dated: __**July 6, 2021**__

_____
UNITED STATES DISTRICT JUDGE

## SPECIAL CONDITIONS OF SUPERVISION

1.      The defendant shall submit to the search of his person, property, home, and vehicle by a United States probation officer, or any other authorized person under the immediate and personal supervision of the probation officer, based upon reasonable suspicion, without a search warrant. Failure to submit to a search may be grounds for revocation.  The defendant shall warn any other residents that the premises may be subject to searches pursuant to this condition

2.      The defendant shall not dispose of or otherwise dissipate any of his assets until the fine and/or restitution order by this Judgment is paid in full, unless the defendant obtains approval of the Court or the probation officer.

3.      The defendant shall apply all monies received from income tax refunds, lottery winnings, inheritance, judgments and any anticipated or unexpected financial gains to any unpaid restitution ordered by this Judgment.

4.      The defendant shall provide the probation officer with access to any requested financial information.

5.      The defendant shall not open additional lines of credit without the approval of the probation officer.

6.      As directed by the probation officer, the defendant shall participate in an outpatient correctional treatment program to obtain assistance for drug or alcohol abuse.

7.      As directed by the probation officer, the defendant shall participate in a program of testing (i.e. breath, urine, sweat patch, etc.) to determine if he has reverted to the use of drugs or alcohol.

8.      The defendant shall abstain from the use of alcoholic beverages and shall not enter, visit, or be present at those places where alcohol is the chief item of sale.

9.      As directed by the probation officer, the defendant shall participate in a co-payment plan for treatment or testing and shall make payment directly to the vendor under contract with the United States Probation Office of up to $25 per month.

10.     As directed by the probation officer, the defendant shall complete up to 20 hours of unpaid community service per week until employed for at least 30 hours per week or participating in a previously approved educational or vocational program.

11.     The defendant shall make payments toward any unpaid criminal monetary penalty in this case during supervised release at the rate of at least 10% of your gross monthly income. Payments are to commence no later than 60 days from placement on supervision. This payment schedule does not prohibit the United States from collecting through all available means any unpaid criminal monetary penalty at any time, as prescribed by law.

## STANDARD CONDITIONS OF SUPERVISION

1.     You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.

2.     After initially reporting to the probation office, you will receive instructions from the Court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.

3.     You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the Court or the probation officer.

4.     You must answer truthfully the questions asked by the probation officer.

5.     You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.

6.     You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.

7.     You must work full time (at least 30 hours per week) at a lawful type of employment,

unless the probation officer excuses you from doing so.  If you do not have full-time employment, you must try to find full-time employment, unless the probation officer excuses you from doing so.  If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.

8.      You must not communicate or interact with someone you know is engaged in criminal activity.  If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.

9.      If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.

10.      You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person, such as nunchakus or tasers).

11.      You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the Court.

12.      If the probation officer determines that you pose a risk to another person (including an organization), the probation officer may require you to notify the person about the risk and you must comply with that instruction.  The probation officer may contact the person and confirm that you have notified the person about the risk.

13.      You must follow the instructions of the probation officer related to the conditions of supervision.